# WHEELING.

## NEASE v. CAPEHART, EXOR.

### July 20, 1874.

1. When a debtor has conveyed land to a trustee to secure a debt, and afterwards another person and the debtor agree that the former shall purchase the land and hold it as a security for the purchase money he pays, and accordingly the debtor acquiesces and the other purchases the land, the transaction constitutes a trust which a court of equity will enforce.

2. Time does not commence to run against a suit to enforce an express trust, till the trustee, by word or act, denies the trust, and the beneficiary has notice of the denial.

3. When a trustee sells the trust subject and receives the money for it, though he promises the beneficiary to pay the money, the court of equity nevertheless retains jurisdiction to enforce the payment

4. A bill cannot be maintained by distributees against an executor of his own wrong, who has sold property of the deceased, to have an account and obtain a decree against the former for the proceeds of the sale, unless the rightful personal representative be a party plaintiff or defendant.

5. When the evidence in behalf of a plaintiff in equity is sufficient to establish his claim, but the counter evidence adduced by the defendant impeaches and contradicts it, and there is such conflict that the court cannot decide the question of fact satisfactorily, it directs an issue.

1874.
June Term.

| | |
|---|---|
| 8 | 95 |
| 35 | 48 |
| 8 | 95 |
| 42 | 577 |
| 42 | 579 |
| 8 | 95 |
| 43 | 370 |
| 43 | 556 |
| 8 | 95 |
| 46 | 60 |
| 8 | 95 |
| 47 | 67 |
| 47 | 68 |
| 8 | 95 |
| 52 | 222 |
| 8 | 95 |
| 61 | 458 |
| 8 | 95 |
| 63 | 76 |

The opinion of the Court contains a sufficient statement of the case.

The Hon. James W. Hoge, judge of the circuit court of Mason county, presided at the hearing below.

*James H. Ferguson, William H. Tomlinson* and *John U. Myers* for the appellants.

*J. W. English, William A. Quarrier* and *Edward B. Knight* for the appellees.

HOFFMAN, JUDGE :

Madison Nease and others, before or early in the year 1870—the time does not appear exactly—brought their suit in equity, against James Capehart, executor of James Capehart, and Henry Capehart, in the circuit court of the county of Mason.    In their bill they allege :

That James Capehart and Henry Capehart were brothers, and that the wife of Rogers was their sister :    That in the year 1839, Henry Capehart and Nehemiah Rogers were jointly seised of two tracts of land in the county of Mason : That being indebted to Tiernan & Co. and M. & F. Tiernan, they, on the 16th day of November in the year 1839, conveyed the lands to George W. Stribling as trustee:    That he, on the 6th day of July, 1840, sold the lands to James Capehart, for the sum of $1,367.53;  and that the trustee, by deed dated the 6th day of July, 1840, conveyed the lands to the purchaser:    That before the sale was made, it was expressly contracted and agreed by and between Henry Capehart and Rogers, of the one part, and James Capehart, deceased, of the other part, that the former should purchase the lands at the sale, for the use and benefit of the latter, and hold the title for their use and benefit until they should repay him the amount of the purchase money with its interest; and that, upon such payment, he should reconvey the lands to them; and that he should permit them to remain in peaceable possession thereof and have and enjoy the rents and profits thereof for their own use and benefit: And that, in pursuance of this agreement, James Capehart did purchase the lands for the sum mentioned, and authorized and permitted Henry Capehart and Rogers to remain in possession of the lands and have the rents and profits:

That Henry Capehart and Rogers agreed that the former should have and hold as his own, in severalty,

the smaller of the tracts, containing 150 acres; and that Rogers should have and hold as his own, in severalty, the other tract, containing 482 acres; and it was agreed between them and James Capehart, deceased, that. the latter, upon being paid his purchase money and interest, should convey to Henry Capehart the smaller tract in severalty, and to Rogers the larger tract in severalty :

That Henry Capehart and Rogers paid to James Capehart the sum of $1,367.53 which he had paid, with the interest that had accrued thereon, before the 31st day of March, 1860; when James Capehart, deceased, by deed of that date, conveyed to Henry Capehart the smaller tract of land :

That James Capehart permitted Rogers to remain on the larger tract as his own and receive the rents and profits thereof, to his own use and benefit, till some time in the year 1850; when, with the consent of Rogers, James Capehart, sold and conveyed to Levi Roush, 200 acres, part of the larger tract, by deed dated the 16th day of August, 1850, for the sum of $475 ; and at the time of the sale it was agreed by and between James Capehart and Rogers, that the sum last mentioned should be received by the former and applied as a credit on the indebtedness of Henry Capehart and Rogers to James Capehart; and that in fact that sum was paid to and received by him : And that Rogers continued in possession of the residue of the larger tract and enjoyed the rents and profits thereof to his own use until his death, which occurred on the 18th day of July, 1852; and that thereafter, Sarah Rogers, his widow, continued in possession and received the rents and profits till the 12th day of December, 1854, and that thereafter, Charles Rogers, one of the children and heirs of Nehemiah Rogers, continued in possession and received the rents and profits, to the use of himself and his co-heirs :

That on or about the 23rd day of October, 1859, James Capehart, without the consent of Roger's heirs, by deed of that date, sold to Samuel Coit the residue of

13

the land, (except about 13 acres which James Capehart had previously sold to the Mason County Mining and Manufacturing Company), and received for that residue the sum of $15,000 in different payments, with interest on those that were deferred; the last of which was paid the 1st day of October, 1868:

That the plaintiffs are the children and heirs and husbands of children and heirs of Rogers, (for whom James Capehart held the legal title in trust): That Rogers died intestate, possessed of a large amount of personal property: And that James Capehart of his own wrong administered upon, took possession of, sold and otherwise disposed of the property to the amount of $1,000; and never rendered any account or made any settlement, but appropriated the proceeds to his own use and benefit:

That before the sale to Coit, James Capehart had been repaid and overpaid his debt:

That after the sale of the land last mentioned, upon James Capehart's assurance that he had made the sale for their exclusive use and benefit, and that he intended and would account for and pay to them the proceeds of the sale when received by him, they acquiesced in the sale, and the plaintiff, Charles Rogers, who was then in possession of the land, as one of the heirs of Nehemiah Rogers, accordingly surrendered the possession to Coit:

That James Capehart never accounted to or with the plaintiffs or any of them for the money received by him from Samuel Coit, or for any of the money or property received by him, James Capehart, as in the bill set forth; nor has his executor since the death of the testator ever accounted for any such money:

That James Capehart departed this life in 1869, having made his will, by which he appointed James Capehart, Jr., the defendant, (and another person who refused to qualify,) his executors; and James Capehart, Jr., qualified in the proper court as the sole executor, and took upon himself the administration of the estate of James

Capehart : That the testator died seised and possessed of a large real and personal estate of the estimated value of $200,000 or more.

The plaintiffs pray that the executor may be required to account to and with them, for the proceeds of the sale to Coit and the other sales stated, made by the testator to Roush and the Mason County Mining and Manufacturing Company ; and for the proceeds of the personal estate of Rogers, deceased, administered upon by the testator ; and that an account be taken, stated and reported of all the payments made by Henry Capehart and Nehemiah Rogers to the testator on account of the debt of $1,367.53 ; and that the executor be required to make and file an inventory of all the real and personal estate of his testator that came to his hands to be administered : And that the plaintiffs have such other relief as to equity pertains.

James Capehart, Jr., the executor, in his answer, admits the relationship of James Capehart, deceased, Henry Capehart and the wife of Rogers ; the execution by Henry Capehart and Rogers of the deed of trust to Stribling, trustee ; the sale of the lands by the trustee, and purchase by James Capehart, deceased, and the execution of the deed by the former to the latter, as alleged : But the respondent says :

He denies that there was any contract or agreement express or implied on the part of James Capehart, deceased, with Rogers and Henry Capehart, or either of them, to purchase the lands for their use and benefit, or to hold the title till they should repay him the amount of the purchase money, and then reconvey to them, or permit them to hold and occupy the lands as their property and enjoy the rents and profits thereof for their own use and benefit : But on the contrary the respondent alleges that the sale was absolute and unconditional, and that James Capehart, deceased, by virtue thereof, became possessed of the absolute title as far as Henry Capehart and Rogers were concerned :

That James Capehart was compelled to purchase the lands for his own protection and security, for the following reasons: On the 31st of March, 1838, Henry Capepart and Rogers conveyed the lands to Samuel G. Shaw, to secure the payment of the following debts: A bond to James Capehart, deceased, for $617.35 of the same date with the deed, payable on demand; a bond to John Capehart for $1,000 dated the 15th of March, 1838, payable on demand; a bond to indemnify James Capehart, deceased, as security for Henry Capehart and Rogers, in an indebtedness to Henry Rupert, administrator, amounting to $300: And by the terms of the deed five years were given to Rogers and Henry Capehart to pay the debts therein secured; which time had not expired at the time of the sale under the deed to Stribling, trustee:

That James Capehart paid off the bond of $1.000 to John Capehart, and the indebtedness for which he, James Capehart, was security to Rupert's estate, secured in the deed to Shaw, trustee: That the debt to James Capehart secured by that deed was never paid by Henry Capehart or Rogers:

That if any such contract as is alleged in the bill was ever made—which the respondent again denies—it is without consideration and is utterly null and void: And, further, that if any such contract was made, it was not in writing, and is void under the statute of frauds and perjuries, which the respondent—as he says—pleads and relies on:

That Henry Capehart and Rogers were men of straightened means and embarrassed circumstances; and James .Capehart, out of kindness, permitted them to occupy the premises, and did not compel them to account for the rents and profits of the lands:

The respondent denies the allegation that it was agreed that Henry Capehart should hold the tract containing 150 acres as his own, and that Rogers should hold the tract containing 482 acres as his own in severalty;

and that James Capehart upon being repaid the purchase money which he had paid for the tracts, with interest thereon, should reconvey the smaller tract to Henry Capehart and the larger tract to Rogers; but says, as he has done before, that there was no contract or agreement by which Henry Capehart and Rogers were to have any interest, jointly or severally, in either of the tracts of land:

That it is true that James Capehart on the 31st day of March, 1860, conveyed a portion of the land to Henry Capehart by deed with covenant of general warranty, with a reservation shown by the deed; that the respondent is not advised of the consideration; but that it was not, and. for reasons suggested, could not have been, made in pursuance of such an agreement as is stated in the bill:

That James Capehart permitted Rogers to remain in possession of the larger tract after his purchase, not in pursuance of any agreement, but simply to aid his sister, the wife of an improvident man:

That James Capehart sold and conveyed 200 acres of the tract to Roush; but that the sale and conveyance was not with the consent of Rogers; nor was it agreed that the proceeds should be received by James Capehart and applied upon the indebtedness of Henry Capehart and Rogers, or that the proceeds were paid to or received by James Capehart in pursuance of any agreement with Rogers:

That Rogers remained in possession of the land till his death, by the permission of James Capehart; and Sarah Rogers, his wife, continued in possession of the land till her death, and her children or some of them continued in possession of it, till the sale by James Capehart to Samuel Coit, by the like permission:

That during all the time from the purchase of the lands by James Capehart to the respective times when he conveyed them, he claimed and exercised full, complete and absolute control over them, and that the pos-

1874.
June Term.

Nease
v.
Capehart,
Exor.

session was held by Henry Capehart and Rogers as his tenants, and by his consent and sufferance:

That about the 23rd of October, 1859, James Capehart, without the consent of the plaintiffs, sold the residue of the larger tract to Coit and conveyed it to him for the price and on the terms alleged in the bill, and that Coit has been in possession of the land since the date of the purchase: That James Capehart did not, at the time of making this sale or afterwards, declare to the purchaser or to the plaintiffs that it was for the benefit of the children or heirs of Nehemiah Rogers, for whom he held the legal title in trust: That if any such declaration ever was made, the same was without consideration and void under the statute of frauds and perjuries; which statute as well as the statute of limitations —as the respondent says—are by the answer pleaded and relied on:

That Nehemiah Rogers died intestate; but that he did not own a large amount of personal property; nor did James Capehart of his own wrong, administer upon the personal estate and take possession of and sell and otherwise dispose of it to the amount of $1,000, or appropriate such estate or any part of it to his own use or benefit:

That James Capehart had not before the sale by him to Coit, been paid in full the amount of purchase money paid by him: That there was no request made by James Capehart to the plaintiffs to acquiesce in the sale by James Capehart to Coit, or agreement on the part of James Capehart that the sale was for the exclusive use and benefit of the plaintiffs, and that the former would pay to the latter the proceeds of the sale; nor was the possession of the land surrendered in consideration of any such agreement:

That James Capehart in his lifetime received from Samuel Coit the purchase money for the land sold him, and that he never accounted to complainants for the money, and this respondent has never accounted to them

for it: That James Capehart did not in his lifetime, nor has this respondent since his death, rendered any account to the plaintiffs whatever:

That James Capehart died on the 25th of January, 1869, having made his will whereby he appointed James Capehart, the respondent, and another his executors; and that the other declined to qualify, and James Capehart qualified as stated in the bill: That the testator died seised and possessed of an estate amply sufficient to meet any legal claim that can be brought against it:

That, as the respondent is advised, the claims asserted in the bill are recoverable, if at all, by the personal representatives of Rogers, and a suit cannot therefore be maintained in the name of his heirs only: And that for these claims the plaintiffs have a plain, complete and adequate remedy at law: And that the court of equity, therefore, has no jurisdiction:

And the respondent prays that these objections may avail to the same extent that a formal demurrer would.

The respondent calls for strict legal proof of every allegation of the bill not expressly or by plain implication admitted.

In an amended bill the plaintiffs allege that Nehemiah Rogers, in his lifetime, and the plaintiffs after his death, while occupying the larger tract of land mentioned in the original bill, made large and valuable improvements, with the full knowledge of James Capehart, deceased, and without any objection on his part:

That at the time of the trust sale of the lands mentioned, they were worth at least $5,000 in cash; and that Henry Capehart and Nehemiah Rogers, but for the agreement with James Capehart, deceased, mentioned, could and would have made some other arrangement for the purchase of the lands for their use and benefit; but relying on the contract and good faith of James Capehart, deceased, they made no other arrangement, and proceeded to perform their part of the contract.

James Capehart, Jr., in his answer says:

That Nehemiah Rogers never did occupy the larger tract of land as his own in severalty ; but that previous to and up to time of the sale in 1840, he occupied the lands as joint tenant with Henry Capehart:

That no partition or agreement for a partition of the land was ever made :

That at the time of the sale of the larger tract, the lands were not worth $5,000 in cash :

That, if, at the time of the sale in 1840, James Capehart had not made as the respondent says he did not make, the agreement mentioned in the bill, Henry Capehart and Rogers could not and would not have made any other arrangement for the purchase of the lands for their own use and benefit; and that they were not, by any such contract, prevented from making any other, and that no such contract as is alleged was ever performed by either party.

The parties state other facts which, or most of which, however, are relied on merely as evidence of the substantial allegations already set forth.

The replication to each answer is general.

The bill was dismissed.

The plaintiffs appealed.

The original bill, without the amendment, involves the question whether, under the law of Virginia, when a debtor has conveyed land to a trustee to secure a debt, and afterwards another person and the debtor agree that the former shall purchase the land and hold it as a security for the purchase money he pays, and accordingly the debtor acquiesces and the other purchases the land, the transaction constitutes a trust which a court of equity will enforce. The amendment to the bill annexes to · this subject of inquiry the additional circumstance that the action of the purchaser prevents the debtor from making any other arrangement to avert an absolute sale of the land; and the original bill and amendment con-

nect other circumstances :   But it may be preferable, and perhaps necessary, to consider the simple question that first presents itself, apart from the other elements, by which it might be influenced.

When I commenced to investigate this case, I hoped to be able to ascertain and state some one or more characteristic principles that uniformly constitute a trust cognizable in equity and distinguish it from a mere contract or other liability, recognized at law :   But upon such examination and reflection as I have had the opportunity to bestow, I find the authorities bearing on several phases of the subject so indistinct and inharmonious, and the subject so intricate, that it would be very difficult to discover and hazardous to assert any such general distinctive principle.   I will, therefore, merely note some of the authorities more or less pertinent, that I have examined, and make such suggestions as occur to me ; and state my conclusion as to whether or not the case in question constitutes such a trust.

It may be worth while to remark, that by different courts and commentators, sometimes the confidence reposed in the trustee or holder of property for the benefit of another, and at other times the interest or right of the beneficiary in or to the property recognized and enforced in equity only, indifferently, is mentioned as the trust.   Perhaps it may be properly said that the confidence is the foundation of the peculiar interest or right, and gives to it the name of trust.   Though, generally, mere mutual promises and a compliance by one party will not create the trust.

Lord Chief Baron Gilbert, in his Treatise on Uses and Trusts, (pp. 1, 2, 59, 270,) says :

" An use is where the legal estate of lands is in a certain person, and a trust is also reposed in him, and all persons claiming in privity under him, concerning those lands that some other person shall take the profits, and be so seised or possessed of that legal estate to make

14

and execute estates according to the direction of the person or persons for whose benefit the trust was created."

"But the chancery that examines the conscience, with regard to men's actions, considers with what design agreements are made; and it is contrary to natural equity that when any man has taken lands to keep for another, he should deceive him, and take the profits himself."

"At common law any use might be raised by words only."

"It seems at common law a use might have been raised by word, upon a conveyance that passed the possession by some solemn act, as a feoffment; but where there was no such act, there it seems a deed declaratory of the uses was necessary; for as a feoffment which passed the estate, might be made at common law, by parol; so by the same reason might the uses of the estate be declared by parol; but where a deed was requisite to the passing of the estate itself it seems it was requisite for the declaration of the uses, as upon a grant of a rent, or the like. So it seems a man could not covenant to stand seised to a use, without a deed, there being no solemn act; but yet a bargain and sale by parol has raised a use without, and it has been held to do so since the statute, in cities exempted out of the statute."

Elsewhere, as is seen, the learned author has stated the proposition, without qualification, that any use might be raised by words only.

I do not see in the passage last quoted any distinction of practical importance to us at this day. I suppose the question, whether the legal estate could heretofore have been or may now be, or in fact is, transferred by deed or parol, or whether the trust is declared by deed or by writing not sealed, would now be deemed in equity a matter of little influence in the determination whether the court would recognize and enforce the use or trust. At any rate, I apprehend such distinction is not material in this inquiry.

Sir Edward Sugden, in his notes upon the work just cited, (p. 52, top p. 111) stating the purport of the decision of the court of King's Bench in the case of *Altham v. Anglesey* (Gil. Eq. Rep., 17) says:

1874.
June Term.

Nease
v.
Capehart,
Exor.

"The common law makes no distinction between trusts and confidences and uses."

Mr. Spence, in his Treatise on Equitable Jurisdiction (vol. 1, pp. 494, 495, 497) says:

"Lord Northington, than whom no one took greater pains to inform himself of the principles on which the the jurisdiction which was entrusted to him, should be exercised, said that in essence ancient uses and modern trusts were the same; that there was no difference in the principles and rules applicable to them; though there might be in the extent of the application of those rules."

"The following is Lord Nottingham's description, in 1676, of express trusts: 'Express trusts are declared either by word or writing; and these declarations appear either by direct manifest proof, or violent and necessary presumption; these last are called presumptive trusts, and that is, when the court, upon consideration of all the circumstances, presumes there was a declaration, either by word or writing, though the plain and direct proof thereof be not extant.'"

Mr. Justice Story, in his Commentaries on Equity Jurisprudence (sec. 964) says:

"A trust, in the most enlarged sense in which that term is used in English jurisprudence, may be defined to be an equitable right, title or interest in property, real or personal, distinct from the legal ownership thereof."

Mr. Perry, in his Treatise on the Law of Trusts, (secs. 8, 13 and 75,) says:

"Our present trusts are almost identical with the old uses."

"Sir Edward Coke's definition of an use has been adopted as an accurate legal description and definition of a trust. In his words applied to a use, 'a trust is a confidence reposed in some other, not issuing out of the

land, but as a thing collateral, annexed in privity to the estate of the land, and to the person touching the land, for which the *cestui que trust* has no remedy but by by subpœna in chancery.'

"It has been a mooted question whether at common law uses could be raised by parol, or even by deed without seal, upon a conveyance of lands. But there seems to be no good reason for the doubt. As the estate itself could be transferred without writing, it would seem to follow that uses declared at the time in the presence of witnesses might be effectually established.

" Mr. Sanders says that in the commencement uses were of a secret nature, and were usually created by a parol declaration. Mr. Lewin says, that trusts like uses are in their own nature averrable, *i. e.*, may be declared by word of mouth without writing, in the absence of a statute requiring it."

Parts of the first, second, third and fourth, and the seventh and eighth sections of the English Statute of Frauds, enacted in 1678, (29 Car. II, Chapter 3,) are as follows:

"Sec. 1. All leases, estates, interests of freehold, or terms of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements, or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing and signed by the parties so making or creating the same, or their agents thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect.

"Sec. 2. Except, nevertheless, all leases not exceeding the term of three years from the making thereof.

"Sec. 3. And moreover, that no leases, estates, or interests, either of freehold or terms of years, or any uncertain interest, * * * of, in, to, or out of any messuages, manors, land, tenements, or hereditaments, shall be assigned, granted, or surrendered, unless it be

by deed or note in writing signed by the parties so assigning, granting, or surrendering the same, or their agents thereunto lawfully authorized by writing, or by act and operation of law.

"Sec. 4. No action shall be brought whereby to charge * * * any person * * * upon any contract or sale of lands, tenements or hereditaments, or any interest in or concerning them * * * unless the agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized."

"Sec. 7. All declarations or creations of trusts or confidences of any lands, tenements, or hereditaments shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will in writing, or else they shall be utterly void and of none effect.

"Sec. 8. Provided always, that where any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise or result by the implication or construction of law, or be transferred or extinguished by an act or operation of law, then, and in every such case, such trust or confidence shall be of the like force and effect as the same would have been if this statute had not been made; anything hereinbefore contained to the contrary notwithstanding."

A part of the first section of the Virginia Statute of Frauds, enacted in 1785, (Ch. 64,) re-enacted at the revisal in 1849, (Ch. 143,) is as follows:

"No action shall be brought * * * to charge any person * * * upon any contract for the sale of real estate, or the lease thereof for more than one year; * * * unless the contract * * * or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent."

It would seem that the English Parliament, in the legislation before us, distinguished between an agreement to

sell land and an agreement to sell an interest in or concerning land; and it unquestionably distinguished between the conveyance or creation of an estate or interest in land and the creation of a trust or confidence of or relating to land. It is manifest that the English statute, with this distinction, was in view when its exact language was in part copied into the Virginia statute. It is therefore very difficult, if not impossible, to escape the conviction, that, when our Legislature adopted and reenacted that part of the statute which requires that a contract for the sale of real estate or a note or memorandum of such contract shall be written and signed by the party to be charged, and discarded and omitted the provision that declared the invalidity of a trust or confidence relating to land, the Legislature intended that the provision re-enacted, with the meaning before attributed to it, should furnish the measure of the statute law on the subject; and that the common law, so far as not thereby modified, would remain in force. But for this circumstance in the legislation, and adjudged cases, it would seem to me, that the general spirit of the statute that requires conveyances of land to be by deed or will; the statutes that require deeds and writings for the conveyance or sale of or in respect to real estate, to be recorded in order to their validity against purchasers for valuable consideration without notice; and the statute quoted requiring a contract for the sale of real estate, or note or memorandum thereof, to be written and signed, in order that an action on it may be maintained; considered together, should influence the court of equity to withhold its action in execution of a trust relative to real estate which in its nature might easily be declared or indicated by writing signed, when not so authenticated.

It is noticeable, that the fourth section of the English statute, as well as the Virginia statute, in terms, merely inhibits an action upon the contract without writing, but does not declare the contract void: While the seventh section of the former statute declares the trust itself ut-

terly void, if not proved by writing. The one provision, in terms, merely inhibits the remedy at law: The other expressly so extinguishes the right, that nothing vital remains for the action of the court of equity, in which, if existent, it would be cognizable. Nevertheless, this Court has adopted the principle of the fourth section and applied it in suits for specific execution of contracts for the sale of lands, when there has not been part performance or some other act or condition that, according to the doctrine of the court, excepts the case from the application of the principle.

Judge Lomax, in his Digest of the Law of Real Property; (vol. 2 p. 145,) says:

"By the English statute of frauds it is expressly required that all declarations of trust, (which is construed to comprehend declarations of uses also) shall be in writing. This section of that statute has not been adopted in Virginia, and the declaration of a use must be regarded as a contract for the sale of land, or conveyance of an estate of inheritance or freehold, or for a term of more than five years, before it can be brought within the provision of our statute of frauds, or our statute of conveyances."

In the case of the *Bank of the United States v. Carrington and others*, decided by the Supreme Court of Appeals of Virginia in 1836, (7 Leigh 566,) John Adams purchased from Marx lots in Richmond, and caused them to be conveyed to Richard Adams, his brother, who executed his notes for the purchase money. John Adams endorsed his notes, and Richard Adams executed a deed to trustees, re-conveying the property to secure the payment of the purchase money. John Adams paid no money at the time, though as endorser of the notes he became responsible for the purchase money, and he afterwards paid it. Richard Adams, by the execution of his notes, became responsible for the purchase money, but received no benefit, whatever.

In that case Judge Brockenbrough says:

"It is a well established principle in England, that if one man purchase an estate in lands and do not take the conveyance in his own name, but in that of another, the trust of the legal estate results to him who pays the purchase money. This trust results by the mere operation of law, though the person in whose name the conveyance is taken executes no declaration of trust. Sugden on Vendors, ch. 115, sec. 2. p. 443 ; *Gascoigne v. Thwing,* 2 Vern. Ch. 366; *Ross v. Norvell,* 1 Wash. 16 ; *Boyd v. Mc-Clean,* 1 Johns. Ch. (N. Y.) 586. The proofs ought however, to be very clear, if the trust does not arise on the face of the deed itself. *Ibid.* And the resulting trust may be proved by parol evidence, after the death of the person in whose name the conveyance is taken. Sugden on Vendors, pp. 444–5 ; *Lench v. Lench,* 10 Ves. Jr. Ch. 511."

The Judge then speaks of the provisions of the seventh and eighth sections of the English Statute of Frauds, already quoted, and proceeds :

"These clauses are not found in our statute of frauds. If in England the courts have decided that where the conveyance is made to a third person, and not to the purchaser, there is a resulting trust to the man who advances the money, much more ought that decision to be made here where there is no law directing the declarations of trusts to be made in writing."

The other Judges expressed similar opinions, and the court held the trust valid.

Of course the English authorities distinguish between resulting trust, that are expressly excepted from the general provision and allowed to be proved by verbal testimony, and other trusts that by the provision are required to be proved by writing. It is however remarkable that some American authorities in states where the same statutory provision are alike applicable to each, or where there is no such provision applicable to either, nevertheless distinguish between the one and the other

class of parol trusts. In several cases in which I see no good reason for it, I find this discrimination.

As well as I can learn without access to the statute books, the Pennsylvania Statute of Frauds, in force from the year 1779 to 1856, as far as it related to real estate, consisted of the principal parts of the first, second and third sections of the English Statute, as they have been above transcribed. That statute did not contain either of the provisions of the fourth, seventh or eighth sections of the English Statute or that of the Virginia statute, which have been transcribed. Though the Pennsylvania statute enacted in 1856, I believe, does embrace the seventh and eighth sections of the original statute.

The provisions of the former statute relative to estates and interests in or out of lands, if they do not actually reach, at least approximate much more nearly to most classes of trusts than the provision of the Virginia statute, which, in language, relates merely to actions on agreements to sell real estate.

As I am informed, the Kentucky and Mississippi statutes on this subject are substantially the same as that of Virginia. The Indiana statute is the same as that of Virginia, except that it has a section providing that nothing contained in any law shall prevent any trust from arising or being extinguished by implication of law.

The statutes of most of the states of the Union contain the provisions of the English statute as to trusts.

In *Lessee of German v. Gabbald*, decided by the Supreme Court of Pennsylvania, in 1811, (3 Binney, 302, 303–5) chief justice Tilghman said, the other two judges, Yeates and Brackenridge concurring:

"The objection to the parol evidence is founded on our act for prevention of frauds and perjuries." "The first section of our act contains the first three sections of the English Statute." "This provision seems to apply rather to legal estates than to trusts, and it was so considered by the English legislature, for they have added

15

a provision with respect to trusts which is entirely omit-
ted in our act of assembly. By the seventh section of
the statute, all declarations or creations of trusts or con-
fidence of any lands, shall be manifested and proved by
some writing signed by the party entitled to
create such trust, or by his last will in writing, or else-
shall be void ; but the eighth section declares, that when
the trust arises by implication or construction of law, or
is transferred or extinguished by act or operation of law,
it shall be of the same effect as if the statute had not been
made. Now if our act does not comprehend the case of
trusts, there is an end of the question, because there will
be nothing to prevent parol evidence of any thing by
which a trust may be inferred."

In *Brown v. Dysinger*, decided in 1829, (1 Rawle,,
408) : On an execution against Shortel, land owned by
him was taken and sold by the sheriff and purchased by
Walker, and a deed was made to him. The testimony
tended to prove that, at the sale, Walker stated that he
was purchasing the land for Brown, and afterwards said
he had bought it for him. Justice Smith, delivering
the opinion of Chief Justice Gibson and himself—a major-
ity of the court—but three Judges sitting—said :

"The question, then, is whether the engagement of
David Walker concerning the land, although not in
writing, is made void by our act for preventing frauds
and perjuries; which in fact was, and is, the turning
point of the case. We are of opinion that it is not, and
that the parol evidence was properly admitted by the
Chief Justice on the trial of the cause. The object of the
act was the prevention of fraud; and to allow it to be
interposed as a bar to the performance of this parol en-
gagement, would, in my opinion, encourage the very
mischief which the legislature intended to prevent.

"David Walker, at the sheriff's sale, declared, again
and again, that he purchased for Samuel Brown. Al-
though he afterwards obtained a deed for the land from
the sheriff to himself, yet in equity, he was, under the

circumstances, a trustee for Samuel Brown; 2 Serg. & Rawle, (Pa.) 461. To me it is evident, that the conduct of David Walker, was calculated to do an injury to Samuel Brown, in much as it prevented others from bidding and purchasing; for his declarations clearly led those inclined to purchase, to believe he was acting for a poor man, that he was buying for him and not for himself. No doubt Samuel Brown was induced by David Walker to rely on him, and therefore, did not take any steps to secure the land, and David Walker should not reap the benefit of such conduct; nor can he, for a trust thereby arises to Samuel Brown, for whom he becomes a trustee. To decide otherwise, and allow him to hold the land, under such circumstances, would be supporting a breach of trust, and a fraud in law ; 4 Serg. & Rawle, (Pa.) p. 539, 540 and 570."

In *Haines v. O'Conner*, decided in 1840, (10 Watts, 319,) Alger issued a *fieri facias* against Haines, which was levied on a lot owned by the latter; and in 1823, the lot was sold and purchased by O'Conner. There was evidence that, at the sale, O'Conner stated he was buying the property for Haines ; but none that he made any promise to the latter or agreement with him, to do so, or that he had any negotiation with him on the subject. On the contrary the evidence rather indicates that O'Conner merely proposed to let Haines have it upon his payment of the purchase money. Judge Grier, President of the court of common pleas, charging the jury, said :

"Many suits have been brought on the supposition, that the case of *Peebles v. Reading*, and *Brown v. Dysinger*, established the doctrine, 'that if I proclaim that I hold my house for B., on terms of conveying to him when he shall reimburse me, this is not a contract for sale within the statute of frauds, but a trust which a court of chancery would execute.

"But those cases do not teach this doctrine, and if they did, it has since been overruled. *Kisler v. Kisler*, 2 Watts, 325.

"Have you any proof to satisfy you that any fraud or contrivance was used by O'Conner to get this property below its value? Is there any evidence that his intention was generally known at the sale? or that even Wendt would have bid a dollar more than was bid for the property? Do you believe that the numerous creditors of the plaintiff, whose claims were not covered by this sale, refused to bid in order that the property might be struck off low for the use of the plaintiff and his family? All the testimony bearing on the subject is that of one witness, who says that O'Conner said to Wendt, 'Do not bid, I am bidding in for Peter.' Was this, if said at all, said for the purpose of an artifice, with an intent to get the property at under price, and then refuse to let the plaintiff have it? Did he get a bargain of the property by this contrivance?"

Justice Rogers, delivering the opinion of the Supreme Court, said:

"A purchaser at a sheriff's sale, who has paid the money, can only be held a trustee, *ex malaficio* on the ground of fraud: and where he is guilty of fraud, he is a trustee for the creditors and for the debtor also, unless the debtor be *particeps criminis*. But without the ingredient of fraud, as in the case of private sales, he may avail himself of the protection of the statute of frauds."

It should be observed, that in this case it does not appear that there was any promise on the part of the purchaser, or negotiation between him and the debtor, or any confidence imposed by the debtor in the purchaser.

In *Jackman v. Ringland*, decided in 1842, (4 Watts & Sergeant, 149,) Jackman the younger, the plaintiff, proved that an execution in favor of Vandergrift against Jackman the elder, was levied on the land of the latter; and in 1819, the land was sold for $600, to Ringland. The plaintiff then offered to prove that there was an agreement between Ringland and Jackman the elder, that Ringland should purchase the land and hold the title, and that Jackman should be at liberty to redeem

1874.
June Term.

Nease
v.
Capehart,
Exor.

the land by payment to Ringland of the purchase money and interest, and a compensation for trouble; that Jackman remained in possession of the land till he died, in 1820; that the plaintiff was the son and heir of Jackman the elder, and at his death was an infant; that, as soon as the plaintiff came of age, he tendered the money and interest, and he had the money in court ready to pay; but the court below rejected the evidence offered, on the ground that, if given, it would not avail.

Justice Rogers, delivering the opinion of the court, said:

"That parol evidence may be received to establish a trust has been repeatedly ruled, but the question is, what is a trust which comes within the principle? It is confined, as I take it, to those cases of resulting trusts which arise from an implication of law, as for example, where the money is paid by one, the property purchased and the title taken in the name of another. In such and similar cases, the legal title is in one, the equitable title in another, and to prevent fraud, the fact of payment may be established by parol evidence. Equity will decree the purchaser a trustee for the use of the person who paid the purchase money. But where there is nothing more in the transaction than is implied from the violation of a parol agreement, equity will not decree the purchaser a trustee. These principles are explicitly recognized in *Kisler v. Kisler,* (2 Watts, Pa. 323); *Sidle v. Walters,* (5 Watts, Pa. 391); *Robertson v. Robertson,* (9 Watts, Pa. 32); *Haines v. O'Conner,* (10 Watts, Pa. 313); *Bixler v. Wilson,* not reported; and in *Fox v. Heffner,* (1 Watts, & Serg. Pa., 372). The latter resembles the present case in all its features. Had it been that Jackman paid the purchase money, it would have been a resulting trust provable by parol, for it is admitted that parol evidence, in a proper case, may be admitted to establish a trust, although the conveyance be absolute on its face. To hold this to be a mortgage, when in truth it is a sale, would be a virtual repeal of the act of frauds. Besides, the same attempt was made

in *Fox v. Heffner*, without success. The fact that the property belonged to Jackman can make no difference. It was a judicial sale, and it would be of the most mischievous consequence if the purchaser at a public sale could at any distance of time have an absolute turned into a defeasable title by parol evidence."

In *Murphy and Butler and wife v. Hubert*, decided in 1847, (7 Penn. St., 420,) Murray made a deed to Delia Chase, for land. She afterwards became Mrs. Butler, and Butler and wife made a deed to Hubert for half the land. Murray died, and his children made a deed to Murphy for the same land. There was testimony tending to prove that Delia Chase had bought the property, in whole or in part, to secure it for the benefit of her brother who was in debt, and that she either paid nothing, or if she paid anything, the money she paid was repaid to her.

The judge below instructed the jury that the statute of frauds required all trusts, interests or estates in lands, to be in writing, except such as arise by operation of law; and that the trust set up was not of that kind.

Chief Justice Gibson, said:

"A careful examination of the cases in our reports has led me to nothing but a few loose dicta which could give color to the doctrine that a parol declaration of trust is within our statute of frauds.

"That the first three sections of the English statute, forming by consolidation the first in our act, are applicable exclusively to legal estates, is demonstrable by the fact, that trusts were specifically provided for in the omitted section, though these sections like our own section contain the clause, 'in law or equity,' on which the opposite hypothesis is founded. The obvious design of it was to prevent an equitable estate from being transferred, and the design of the seventh section was to prevent a trust estate from being created by parol. As was intimated in *Pugh v. Good*, (3 Watts & Serg., Pa., 56,) much misconception has arisen by looking into the English statute and the decisions on it, and not exclusively to

·our own.   Perhaps no decision has declared in words

that an express parol declaration of trust is valid in Pennsylvania; but all the decisions in support of implied trusts have gone on a principle which extends ·equally to them.   Had the substance of the seventh section been adopted by the courts here, it might have been considered as a part of our common law; but the current of judicial decision has undoubtedly swept the ·other way.   As to the point before us, there is neither difficulty nor doubt; but the direction as to other points .seems to have been ·unexceptionable."

In *Graves v. Dugan,* decided in 1838 (6 Dana, 331): At a sheriff's sale on an execution against Dugan, in 1827, a tract of land owned by Dugan was sold and ·Graves bought it, and in 1832 he obtained from the .sheriff a conveyance for the land.

Dugan filed a bill alleging that the purchase was made at .his instance, for his benefit, and with his money. ·Graves, in his answer, denied that he had bought the land for Dugan, or that the latter had paid the price.

Chief Justice Robertson, delivering the opinion of the court, said :

" Such a resulting trust as that claimed in this case should be established by clear and convincing evidence of the only fact from which it could have arisen by implication of law; that is, the payment by Dugan of the money, in consideration of which the conveyance was made to Graves by the Sheriff."   "A trust did not result by implication of law from such a payment to Graves :after he had paid the sheriff with his own money.   Nor could any trust created by an oral agreement merely, be ·enforced against Graves consistently with the statute of frauds and perjuries."

In *Green v. Ball,* decided in 1868, (4 Bush, 586,) Weller, administrator of Cooper, sued Green in equity, to ·enforce a vendor's lien for $2,000, with interest, on land .sold by Cooper to Green for that amount, and under a judgment in the suit the land was sold and purchased by

Mitchell, to whom it was conveyed. He subsequently conveyed the land to Ball, who brought suit for the possession. The defendant answered that the purchase by Mitchell was made in pursuance of an express contract between him and the defendant, that Mitchell would purchase the land for the debt and take the responsibility of paying for it, for the defendant, in order to avoid a sacrifice of the land, and that the purchase should operate as a mortgage to secure repayment to Mitchell.

Judge Hardin, delivering the opinion of the court, said:

"The agreement between Mitchell and the appellant not being alleged to have been in writing, it is contended that it could not be set up and enforced for the appellant's relief, because, by the first section of chapter 22 of the Revised Statutes, the right of action is prohibited on contracts existing in parol, for the sale of real estate."

"If we were required to construe the statute, unaided by any previous decisions of this court, we should not be inclined to regard it as applicable to this case, as the alleged parol agreement does not reasonably import a sale of the land by Mitchell to the appellant, but simply a contract devolving a trust on Mitchell, which the appellant might enforce in equity if not fraudulent on his part, or within the interdiction of some law other than the statute of frauds. But that such a contract is not within the operation of the statute, may be regarded as settled by repeated decisions of this court. *Langhorne v. Payne*, 14 B. Mon., (Ky.,) 624; *Martin v. Martin*, 16 B. Mon., (Ky.,) 8; *Miller's Heirs v. Antle*, 2 Bush, (Ky.,) 407."

In the case of *Williams Sr. v. Williams Jr.*, decided in 1871, (8 Bush 241): Under an execution in favor of the *Louisville* and *Shepardsville Plank-road Company* against *Williams Jr.*, in July, 1855, a tract of land owned by him was sold, and purchased by Tyler, agent of the Company. It seems that by the law of Kentucky, after such a sale there was a right of redemption. Under an-

other execution in favor of *Brown* against *Williams Jr.*, in 1856, his equity of redemption in the land was sold, and purchased by Brown. Afterwards, in the same year, Brown and Tyler each assigned to Meriwether and Williams Sr. all the right title and interest they acquired by their respective purchases; and the sheriff made a deed to them for the land. In 1860, Meriwether released his interest to Williams Sr.. Williams Jr., in his petition alleged that the transaction between Brown & Tyler, and Meriwether and Williams Sr., were all for his benefit, under an agreement to that effect; that each of the purchases was under a like agreement and trust, with the right on his part to redeem the property— and that the appellant held it merely as security for the money advanced. Williams Sr., denied the allegations of the bill, and relied on the statute of frauds. The circuit court permitted the petitioner to redeem; and the Court of Appeals unanimously affirmed the judgment.

Chief Justice Pryor, delivering the opinion of the court, says :

"The facts show that this was not a sale of any lands to the appellee by the appellant, but a mere holding of the legal title obtained upon a promise made to extend the time of redeeming the plaintiff's property, and as a security for the moneys they had advanced for him."

After quoting from the. cases of *Griffin v. Coffey* and *Green v. Ball*, (already referred to,) and other cases, the Chief Justice proceeds :

"In our opinion, this was a trust that might have been enforced as against either Meriwether or the appellant, and that they obtained the deeds and held the property merely to secure them in the money they had advanced for the appellee, and that such was the understanding and agreement of all the parties."

The principle decided is generalized in the syllabus, thus :

"A trust was created by purchasing land at execution

*1874.*
*June Term.*

Nease
v.
Capehart,
Exor.

1874.
June Term.

Nease
v.
Capehart,
Exor.

sales upon a verbal agreement between the owner and purchaser that the purchaser would hold the land as security for the money advanced and interest, and that the owner should have the right to redeem.

"Acquiring and holding the legal title to land by purchasing at execution sales and otherwise, under a verbal agreement between the owner of the land and the purchaser that the land and title should be held as a security for moneys advanced and interest thereon, and that the owner should have the right to redeem the lands, created a trust which is enforced."

In *Arnold v. Cord*, decided by the Supreme Court of Indiana in 1861, (16 Ind. 177), Judge Perkins said:

"Suit to avoid a conveyance for fraud. Judgment was rendered for the plaintiffs."

"The facts of the case are these: Cord had mortgaged his land to the State; Arnold induced Corn to let him purchase the land at the sale on the mortgage, promising to hold it for Cord's benefit, and to permit him to redeem it: Arnold intending all the time to cheat Cord out of the land. He promised to give Cord a right to redeem, but baffled him in relation to it, till it was too late for Cord to raise the money to prevent the sale, and after the sale refused it altogether."

"A person agreeing verbally to bid in land for another at a sheriff's sale, shall be bound and decreed to hold in trust. though he took the title in his own name, and pleaded the statute in bar. *Denton v. McKenzie*, 1 Desaussure, 289."

In *Soggins v. Heard*, decided by the Supreme Court of Mississippi in 1856, (31 Miss., 426) Judge Fisher, delivering the opinion of the court, said:

"It is not now an open question, that when a party agrees before the sale to purchase property about to be sold, under an execution against a party, and give such party the benefit of the purchase, that the agreement is binding, and will be enforced. The defendant, upon the faith of such an agreement, may have ceased his efforts to

1874.
June Term.

Nease
v
Capehart,
Exor.

raise the money for the purpose of paying off the execution, and thus preventing a sale of his property. It will not do to say that the party promising was moved merely by friendly or benevolent considerations, and may therefore, at his option, decline a compliance with his agreement. Such considerations constitute the foundation of almost every trust, and the trustee should be held to account as nearly as possible, in the same spirit in which he originally contracted. But it is said that the agreement, if in fact made, was void under the statute of frauds. The statute has reference alone to the sale of lands, and not to a contract to purchase by one person for the benefit of another."

It is observable that, in most of the cases cited, as well as others of kindred character that I have examined, where the trusts have not been sustained, the effect of the statute of frauds is assigned as the sole or principal reason of their invalidity. Generally, the treatment of the subject unmistakably indicates the understanding on the part of the judges, that, if the declarations or indications of trusts had been in writing and signed by the party sought to be charged, they would have been sustained. But, as we have seen, in Virginia there was no statute of frauds applicable to trusts except those arising in agreements to sell real estate—and parol trusts were as valid as written ones.

Mr. Perry in his Treatise on Trusts (sec. 96) says:

"Where there is no valuable consideration, yet if the settler, by a clear and explicit declaration, duly executed and intended to be final and binding upon him, makes himself a trustee, courts of equity will enforce the trust, whether the nature of the property be legal or equitable, and whether it be capable or incapable of transfer. If it is a mere agreement, without consideration, to create a declaration of trust, courts will not act upon it; but if a party has declared himself to be a trustee, the beneficiary interest in the property becomes vested in the *cestui que trust* without further action, and *cestui que trust* can enforce his rights."

The cases of *Pye and Dubost, ex parte,* (18 Ves. Jr. Ch. 140,) and *Stapleton v. Stapleton,* (14 Sim. 186–87, 37 Eng. Ch. Rep.) and some other cases cited by Mr. Perry, which I have seen, and the late case of *Morgan v. Malleson,* L. R. 10 Eq. 475,) go far to sustain this statement. These cases leave a very narrow and imperfectly defined border between trusts and mere promises. They relate to trusts of personalty : But, where the statute of frauds does not apply, I do not perceive any difference between trusts of real and personal property. It would seem that when the former are, the latter likewise would be deemed valid.

Chancellor Kent, in his Commentaries (vol. 4 pp. 135, 143,) says :

"A mortgage is the conveyance of an estate by way of pledge for the security of debt, and to become void on the payment of it. The legal ownership is vested in the creditor ; but, in equity, the mortgagor remains the actual owner, until he is debarred by his own default, or by judicial decree.

"A deed, absolute on the face of it, and though registered as a deed, will be valid and effectual as a mortgage, as between parties, if it was intended by them merely as a security for a debt, and this would be the case though the defeasance was by an agreement resting in parol ; for parol evidence is admissible in equity, to show that an absolute deed was intended as a mortgage, and that the defeasance has been omitted or destroyed by fraud, surprise or mistake."

Late authorities, however, affirm, generally, that when the purpose of the conveyance is to secure the payment of money, the right in equity to redeem will exist, though there be no fraud, mistake, or surprise, other than the promise or indication by the grantee that, on the payment of the money, he will reconvey, and the failure to do so.

In the *Bank of the United States v. Carrington,* (7 Leigh 566—see 687,) President Tucker said :

"Whatever may be the doubts elsewhere, it has been with us long established that the equity of redemption may be sustained by parol evidence, and that a deed absolute on its face may by such evidence be turned into a mortgage. *Ross v. Norvell*, 1 Wash. 14. *Robertson v. Campbell*; 2 Call 421, *Conway v. Alexander*, 7 Cranch (Sup. Ct. U. S.) 218."

In *Phelps v. Seely and others*, (22 Gratt. 573—see 589,) Judge Bouldin delivering the opinion of the court, said:

"There is no doubt that a resulting trust may be set up by parol testimony against the letter of a deed; and it is also true that a deed absolute on its face may by like testimony, be proved to be only a mortgage."

Each of the judges just mentioned states the proposition quoted, generally.

In *Morris v. Nixon's Executors*, decided by the Supreme Court of the United States in 1843, (1 How. 118,) Morris, through his brother, applied to Nixon, his brother-in-law, to loan him $5,000 on a mortgage of real estate. Nixon insisted on an absolute conveyance by the former to him, in consideration of a previous indebtedness—which he said would be a full consideration—and a bond for the $5,000; but Nixon suggested that, if he should think fit, he might use his right for the benefit of Morris and his family; and he wrote to Morris that he was sure he had confidence in him as to the mode proposed. Morris complied. Mr. Justice Wayne delivering the opinion of the court, said:

"Our object is to dispose of the case for the present, by assigning to the deed its true character in equity, under all the circumstances attending its execution.

"The charge against Nixon is, substantially, a fraudulent attempt to convert that into an absolute sale which was originally meant, by himself and the complainant, to be a security for the loan. It is in this view of the case that the evidence is admitted to ascertain the truth of the transaction, though the deed be absolute on its face. The transaction was begun by Morris, with the

request of a loan from Nixon, for which he offered a se-curity upon the property for the management of which Nixon was his agent. It ended by Morris giving to Nixon a deed for the property, absolute on its face, and also a bond for a loan of $5,000. Unless, then, some proof has been given to show that they truly bargained upon another footing, and that the loan did not form the chief inducement for the execution of the deed, and had not been treated by both parties as a substantial part of the consideration, though not expressed in the recital, equity will interpret it to be a security for money loaned."

In *Babcock v. Wyman,* decided in 1856, (19 How. 289) Wyman was indebted to Babcock, his brother-in-law, as trustee and executor, and land of the for-mer was mortgaged to the latter to secure the debts. Babcock urged Wyman to make him an absolute deed for the land, that he might manage it and apply the rents and profits to the interest and liquidation of the principal of the debts; and Wyman by deed purporting to be in consideration of a sum corresponding with that of the debts and interest due, conveyed the estate to Babcock, with the express understanding that the con-veyance should stand as a security only for the debts ; and Wyman delivered to Babcock possession of the land.

. Mr. Justice McLean, delivering the opinion of the Court, said :

"Such a transaction as set out in the bill, between brothers-in-law, in the nature of things might be sup-posed to have taken place in the mutual confidence of the parties; and in the final adjustment there should be no evasions or subterfuges to gain an advantage."

The learned Justice quotes from a number of cases, and the Court, two Justices dissenting, held that the conveyance is a mortgage.

.. In *Russell v. Southard,* decided in 1851, (12 How. 139,—see 147.) Mr. Justice Curtis, delivering the opin-ion of the Court, said :

*Margin notes:*

1874.
June Term.

Nease
v.
Capehart,
Exor.

"To insist on what was really a mortgage, as a sale, is in equity a fraud, which cannot be successfully practiced, under the shelter of any written papers, however precise and complete they may appear to be.

"This view is supported by many authorities. *Maxwell v. Montacute,* Precedents in Ch. 256; *Dixon v. Parker,* Ves. Sr. Ch. 225; *Prince v. Bearden,* 1 A. K. Marsh. (Ky.) 169; *Oldham v. Halley,* 2 J. J. Marsh, (Ky.) 113; *Whittick v. Kane,* 1 Paige, Ch. (N. Y.) 202; *Taylor v. Luther,* 2 Sumner, (1st Cir. U. S.) 232; *Flagg v. Mann, Ibid.* 538; *Overton v. Bigelow,* 3 Yerg. (Tenn.) 513; *Brainerd v. Brainerd,* 15 Conn. 575; *Wright v. Bates,* 13 Verm. 341; *McIntyre v. Humphries,* 1 Hoff. Ch. (N. Y.) 331; 4 Kent. Com. 143, note A., and 2 Greenl's Cruise, 86, note.

"It is the doctrine of this court, that when it is alleged and proved that a loan on security was really intended, and the defendant sets up the loan as a payment of purchase money, and the conveyance is a sale, both fraud and a vice in the consideration are sufficiently averred and proved to require a court of equity to hold the transaction to be a mortgage."

In *Campbell v. Dearborn,* decided by the Supreme Judicial Court of Massachusetts in the present year, (American Law Times for March, 1874, to be reported in 109 Mass:) Dearborn the defendant advanced money to pay a debt due from Campbell, the plaintiff to Tirrill, for a tract of land; and five days afterwards Campbell executed to Dearborn a deed, on its face conveying the land absolutely. It seems that at first, the plaintiff had reason to believe that the defendant advanced the money, as a friendly act, with a view to give the plaintiff time to raise it, and would in a few days, on repayment of the money and a compensation for his trouble, reconvey the land: No definite time was named for the repayment. Afterwards the defendant refused to take a mortgage, insisting on the ownership of the property; and the conveyance was made.

Justice Wells, delivering the opinion of the court, said :

"From the whole case we are satisfied that it was a transaction between borrower and lender, and not a real purchase of the land by the defendant. We are brought then, to the question, can equity relieve in such a case ?

"We cannot concur in the doctrine advanced in some of the cases, that the subsequent attempt to retain the property, and refusal to permit it to be redeemed, constitutes a fraud and breach of trust, which affords ground of jurisdiction and judicial interference. There can be no fraud or legal wrong in the breach of a trust from which the statute withholds the right of judicial recognition."

But the Justice refers to the doctrine of the Supreme Court of the United States and of different states, that an advance of money and absolute conveyance of land, with the purpose, in fact though not expressed, to secure the payment, is in equity treated as a mortgage; and proceeds :

"Upon the whole, we are convinced that the doctrine may be adopted without violation of the statute of frauds, or any principle of law or evidence ; and if properly guarded in administration, may prove a sound and salutary principle of equity jurisprudence. It is a power to be exercised with the utmost caution, and only when the grounds of interference are fully made out, so as to be clear from doubt.

"Although proof of the existence and continuance of the debt, for which conveyance was made, is most influential to that effect ; yet the absence of such proof is far from being conclusive to the contrary. *Rice v. Rice,* 4 Pick, (Mass.) 349 ; *Flagg v. Mann* 14 Pick, (Mass.) 467, 478 ; *Russell v. Southard,* 12 How. (Sup. Ct. U. S.) 139 ; *Brown v. Dewey,* 1 Sand. Ch. (N. Y.) 56. When it is considered that the inquiry itself is supposed to be made necessary by the adoption of forms and outward appearances differing from the reality, it is hardly reasonable

that the absence of an actual debt, manifested by a written acknowledgment or an express promise to pay, should be regarded as of more significance than the absence of a formal defeasance. It of course compels the party attempting to impeach the deed to make out his proofs by other and less decisive means. But as an affirmative proposition it cannot have much force.

"A mortgage may exist without any debt or other personal liability of the mortgagor."

In *Griffin and wife v. Coffey*, &c., decided by the Court of Appeals of Kentucky, in 1849, (9 B. Mon. 452): Under an execution in favor of Gann against Griffin, for debt, the dower interest of Griffin's wife in a lot that had belonged to a former husband was sold by a sheriff, and purchased by Gann; and the sheriff conveyed to him. He conveyed to Coffey. Subsequently another execution in favor of Gann against Griffin, for the residue of the same debt, was issued, to be levied on the equity of redemption; when Coffey paid to Gann the amount of the whole debt. Griffin and wife in their bill alleged that Coffey redeemed the property for them, and at their request took a conveyance in his own name for his indemnity, till the rents would pay the sum expended. Coffey denied the allegation.

Judge Simpson, delivering the opinion of the court, said:

"In our judgment, the evidence, notwithstanding the denial of Coffey in his answer, established the fact that the redemption of the property purchased by Gann, under the execution, was made by Coffey at the instance of the complainants and in trust for them."

In a case such as we have under consideration, the party who has conveyed land to a trustee to secure a debt to another, has, in equitable contemplation, the right of redemption. He owns the land subject to the payment of the debt. He may have the means to pay the debt or otherwise prevent or procure a postponement of a sale, or to promote competition among bidders, or

1874.
June Term.

Nease
v.
Capehart,
Exor.

17

in some way to save the land or avert its sacrifice.    The capitalist voluntarily agrees to aid the debtor.   He invests his money and receives the interest on it, and takes and holds the land as security, with the right to proceed to foreclose, as in the case of a mortgage executed by the one party directly to the other.    Accordingly, the one makes the purchase, and the other acquiesces.    If the debtor has means to prevent or postpone a sale, or to promote competition at it, the agreement naturally prevents him from doing so.    The existence of the agreement, itself, if known, will generally tend to stifle competition.

When in fact the agreement has such influence on the debtor, and such effect as to the sale, there is no doubt that the purchaser should be deemed and treated as a trustee, first, for his own security, and, secondly, for the benefit of the debtor.    But, while the nature of the transaction creates a strong presumption that it has such influence and effect, other proof satisfactory to establish the fact may not always or generally be attainable. When the purchaser solemnly agrees with the debtor to hold the estate merely as a security for the money advanced, with interest, but without further benefit to himself, determinable in equity upon the payment of money and interest, and he accordingly makes the purchase subject to this qualification, and the other acquiesces; it seems much more just that the estate so acquired should be held subject to the stipulated equitable qualification, without proof that the debtor was able to protect his own interest, than that the condition should be liable to be repudiated by the purchaser unless such proof can be supplied by the debtor.    Besides, a simple, uniform rule, by which the right may be determined by the agreement, and the purchase and acquiescence, without substantive proof of consequences, is much more convenient and conducive to certainty, confidence and quiet as to the rights of parties.

In a mortgage in which the borrower  or other debtor

conveys land by deed absolute on its face, with a parol agreement that it is but a security for money, the mortgagee advances the money upon interest and receives no other benefit; and the debtor conveys the land subject to his equitable right. Here, the purchaser advances the money upon interest, and the debtor consents that he may purchase and so acquire the legal estate from the trustee, subject to the debtor's equitable right of redemption; and accordingly the purchaser acts and the debtor acquiesces. The only difference in principle, that I perceive, between the two cases is, that in the former the debtor, except so far as he is impelled by the pressure of his own pecuniary necessities, has the option to execute the deed or not; while in the case in question he may or may not be able to prevent the sale. But, according to the authorities quoted, when the purchaser agrees with the debtor that his purchase shall be subject to this condition, the agreement dispenses with inquiry as to the ability of the debtor to obviate the sale. In its essential characteristics, then, this transaction does not differ from a simple mortgage created by an absolute deed subject to a parol condition. Such a transaction is not deemed a mere contract for the sale of land.

If the agreement that the legal estate acquired by the purchaser should be held only as a security for the debt, determinable in equity upon payment, were in writing and signed by him, then, without serious question, it is supposed, the qualifying agreement would be recognized and the trust or equitable condition would be enforced. But if, independently of the English Statute of Frauds, an oral trust may be annexed to a conveyance by deed, and the case is not within the Virginia statute, it is not perceived to be material, whether the agreement be oral or written.

The distinction between mere contracts creating legal rights, and the constitution of trusts cognizable in equity, is a subject of much interest, that invites the thorough and analytical research and examination of

courts and jurists having the opportunity to bestow upon it the necessary attention.

There is, unquestionably, strong reason to apprehend that evidence of oral agreements establishing independent rights, and qualifying estates and rights created by deed, apparently absolute, is admitted much more extensively than is consistent with the certainty and security of titles. This, however, as has been seen, results in part at least, from the limited scope of the Virginia statute of frauds—an imperfection which it is presumed will ere long arrest the attention of the Legislature.

The English statute declaring the invalidity of trusts not proved by writing has been so important a protection against the defect and uncertainty of human understanding and memory, as well as the crime of wilful falsehood, that, notwithstanding the limited education formerly prevailing, it has been found eminently expedient. Now that education is so general that all can either write or readily procure others to do so, there is little doubt that the Legislature will adopt the provisions of the English statute, with its judicial interpretation, or other provisions equally or more efficacious.

I wish not to be understood as approving all the authorities I have quoted, tending to the result at which I arrive. And I deem it proper to say that it is not with entire satisfaction that I accept the conclusion which I adopt. But in the present state of the law—as it is the more consistent with the volume of authorities, and, I believe, with the general understanding of the people of the State—I think it more conducive to the dispensation of justice.

But the parol agreement which will change an estate that, by the terms of the deed creating it, is absolute, into an estate held in trust to secure a debt, and, upon the payment of the debt, for the benefit of the debtor, should be actual, complete and unequivocal ; and the evidence to establish it should be full and convincing.

In the case in judgment, the evidence in behalf of the plaintiffs is sufficient to establish the trust, but the counter evidence adduced by the defendant, in whole or in part, impeaches and contradicts it. Thus, the evidence so conflicts as to make it impossible for the court to decide the question of fact satisfactorily, and so constitutes a case especially appropriate for the consideration of a jury that may see the witnesses and hear them thoroughly examined.

By the answer, and in argument, other questions have been made; but none of serious difficulty.

Time does not commence to run against a suit to enforce an express trust, till the trustee, by word or act, denies the trust and the beneficiary has notice of the denial. Here Nehemiah Rogers and the plaintiffs had possession of the land till James Capehart sold it in the year 1859. Only a part of the purchase money was paid in hand; and the last payment was not made till the year 1868. At any rate, if the trust existed, the evidence does not prove such a denial of it by James Capehart, or notice of denial to the plaintiffs, and time thereafter, as would bar the suit.

When a trustee sells the trust subject and receives the money for it, though he promises the beneficiary to pay it, the court of equity nevertheless retains the jurisdiction to enforce the payment. The allegation in the bill, whether proved or not, that after James Capehart sold the land he promised the plaintiffs to pay them the money, does not preclude the court from taking cognizance of the case.

A bill can not be maintained by distributees against an executor of his own wrong who has sold property of the deceased, to have an account and obtain a decree against him for the proceeds, unless the lawful representative be a party, either plaintiff or defendant. As in this case, the main purpose of the bill is to enforce the alleged

trust and no personal representative has sued or been made a defendant; and as we do not know that this will be done; it is not necessary now to consider whether the different causes of suit may be prosecuted together.

For the reasons stated, the decision of the circuit court of the county of Mason, pronounced on the 24th day of May, 1872, is reversed, with costs to the appellants, against James Capehart, executor of James Capehart, deceased, and an issue is ordered to be tried in that court, as to whether before the sale of the tracts of land, one containing 150 acres and the other 420 acres, made on the 6th day of July, in the year 1840, by Stribling, the trustee, to James Capehart, in the bill stated, it was agreed by him and Henry Capehart and Rogers that James Capehart should purchase the two tracts of land for the benefit of Henry Capehart and Rogers, and hold then merely as a security for the purchase money paid by him therefor with interest.

And the cause is remanded to the circuit court for further proceedings.

HAYMOND, PRESIDENT, and PAULL and HOFFMAN, JUDGES, concur in the foregoing opinion, as well as in the points decided.

Absent, MOORE, JUDGE.

DECREE REVERSED AND SUIT REMANDED; AND AN ISSUE ORDERED TO BE TRIED AT THE BAR OF THE COURT BELOW.